# Illinois Official Reports

## Appellate Court

***In re Estate & Trust of Weidner*, 2016 IL App (4th) 160306**

| | |
|---|---|
| Appellate Court Caption | *In re* ESTATE AND TRUST OF EVELYN K. WEIDNER, First Mid-Illinois Bank & Trust, N.A., Trustee of Gerald and Laveda Weidner Trust; and James Gregory Peters, Petitioners-Appellees, v. Lila Jolene Peifer, Patricia Miller, Carolyn S. Baker, Lyle J. Weidner, Kevin Weidner, and Curtis Weidner, Respondents-Appellants). |
| District & No. | Fourth District<br>Docket No. 4-16-0306 |
| Filed | December 20, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Piatt County, No. 13-CH-45; the Hon. Timothy J. Steadman, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | John T. Wozniak (argued), of Fischer & Wozniak, P.C., of Urbana, and Darrel F. Parish, of Parish & Castleman, LLP, of Decatur, for appellants.<br><br>Denis Knipp Bates and Kenneth D. Reifsteck (argued), of Thomas, Mamer & Haughey, LLP, of Champaign, for appellee.<br><br>Blake Weaver (argued), of Novak, Weaver & Solberg, of Urbana, for petitioner James Gregory Peters. |

| Panel | PRESIDING JUSTICE KNECHT delivered the judgment of the court, with opinion.
Justices Holder White and Pope concurred in the judgment and opinion. |

## OPINION

¶ 1 Respondents, Lila Jolene Peifer, Patricia Miller, Carolyn S. Baker, Lyle J. Weidner, Kevin Weidner, and Curtis Weidner, appeal from the trial court's order finding James Gregory Peters (Greg) to be a descendant of Betty Peters for purposes of distribution under the Evelyn K. and Lyle F. Weidner, Sr. Trust and the Evelyn K. Weidner Children's Trust. We affirm.

¶ 2                              I. BACKGROUND

¶ 3 On November 26, 1967, Greg was born to Ron and Patricia Peters. In 1970, Ron and Patricia divorced. Patricia was granted custody of Greg, subject to Ron's visitation rights. Greg resided with Patricia in the Champaign-Urbana area for a majority of his childhood.

¶ 4 In 1973, Ron moved in with Betty. In 1978, Ron and Betty were married. Between late 1982 and early 1983, Greg resided with Ron and Betty in Farmer City. From November 16, 1982, through January 13, 1983, Greg was enrolled in Farmer City schools.

¶ 5 On July 29, 1988, Evelyn K. and Lyle F. Weidner, Sr., created an irrevocable *inter vivos* trust—the Evelyn K. and Lyle F. Weidner, Sr. Trust—to provide for the extra and supplemental needs, comforts, and luxuries of their daughter Donna Weidner. The trust terminated upon Donna's death, after which any balance was to be distributed to certain then-living children, grandchildren, descendants, or descendants of the named grandchildren of Evelyn and Lyle Sr. In relevant part, the trust directed the distribution of one-fifth of the trust *res* to the "Settlors' daughter, BETTY JEAN PETERS, if then living; and if not then living, to her descendants, per stirpes, then living; and if there are no such descendants of said BETTY JEAN PETERS then living, then in equal portions to the [other then-living] beneficiaries."

¶ 6 That same day, Evelyn executed the Last Will and Testament of Evelyn K. Weidner, which created a testamentary trust—the Evelyn K. Weidner Children's Trust. In her will, Evelyn provided Lyle Sr. with a life estate in her farm real estate. Subject to Lyle Sr.'s life estate, Evelyn provided that the farm real estate was to pass to the trustee of the Evelyn K. Weidner Children's Trust. Upon Lyle's death, the income from the farm real estate was to be distributed to certain then-living children, grandchildren, descendants, or descendants of the named grandchildren of Evelyn and the trustee of the Evelyn K. and Lyle F. Weidner, Sr. Trust. In relevant part, the trust directed one-sixth of the income "to my daughter, BETTY JEAN PETERS, if then living; and if not then living, to her descendants, per stirpes, then living; and if there are no such descendants of said BETTY JEAN PETERS then living, then in equal portions to the [other then-living and trust] beneficiaries." The trust terminated upon Donna's death, after which any balance was to be distributed to certain then-living children, grandchildren, descendants, or descendants of the named grandchildren of Evelyn. In relevant part, the trust directed the distribution of one-fifth of the trust *res* to "my daughter,

BETTY JEAN PETERS, if then living; and if not then living, to her descendants, per stirpes, then living; and if there are no such descendants of said BETTY JEAN PETERS then living, then in equal portions to the [other then-living] beneficiaries."

¶ 7    In November 1989, Evelyn died and her will was admitted to probate.

¶ 8    In September 1990, Betty adopted Greg. Betty was 47 years old, and Greg was 22 years old. The adoption file was sealed.

¶ 9    In July 1996, Lyle Sr. executed the Last Will and Testament of Lyle F. Weidner, Sr., which excluded Greg by name. In August 1997, Lyle Sr. executed his first codicil to that will, which defined Lyle Sr.'s descendants as his own children and their "lawful, natural, blood descendants," including persons adopted by them prior to attaining the age of 18.

¶ 10    In December 2000, Lyle Sr. died. The trustee of the Evelyn K. Weidner Children's Trust began making income payments from Evelyn's farm real estate to the remainder beneficiaries, including Betty.

¶ 11    In January 2005, Betty died. Following Betty's death, the portion of the income payments from the farm real estate earmarked for Betty or her descendants was divided amongst the other then-living beneficiaries. Greg never received income payments from the farm real estate.

¶ 12    In September 2012, Donna died. The *res* from the Evelyn K. and Lyle F. Weidner, Sr. Trust was distributed, none of which went to Greg. Following that distribution but before the full distribution of the Evelyn K. Weidner Children's Trust, Greg asserted claim to a share of each trust.

¶ 13    At a February 2016 hearing, Greg testified regarding his relationship with Betty and the Weidner family. Greg knew Betty since he was six. Betty transported Greg to and from Patricia's home for visitation with Ron. Betty was always present during visitation. Greg spent time with Betty and Ron every other weekend, if not every weekend. Betty had always talked about having Greg as her son. Betty attended Greg's high school graduation. On Fridays, Betty and Greg would spend time at Evelyn's home. Greg attended Weidner family vacations and spent time with the Weidner family during holidays, including his birthday. Up until her death, Greg received birthday cards and presents from Evelyn.

¶ 14    Greg also testified regarding the circumstances surrounding his adoption. Greg stated:

"I think Betty would have probably tried to adopt me earlier in life but since I had such a good relationship with my mother, I don't think Betty ever wanted to cross that boundary and then make it a fight, you know, because they got along. And Betty came to me around that time and said that she would really like to adopt me for estate reasons, and you know, Betty really loved me. I mean, you know, we shared a great I guess mother-son relationship the whole time, you know, I was growing up. We never had any fights or any arguments or any of that sort of effect. And this, the way she told me about this was if she adopted me this would give me the opportunity to be in her estate, plus it wouldn't take any rights away from my mother. It wouldn't be like she was stepping on my mother's feet to adopt me."

When later again questioned regarding the adoption, Greg stated:

"I mean it was for the estate itself. Betty loved me a lot and she wanted to make sure that if something happened to her before it happened to my father, that she wanted me to have a little bit of something. That was the conversation we had."

At the time of the adoption, Greg was living 10 miles from Betty and Ron and had been Betty's step-son for 12 years. Greg later moved away for a couple of years but ultimately returned and spent much of his time with Betty and Ron. Greg was at Betty's bedside when she passed. Greg considered Betty to be his mother. Greg first told Patricia about the adoption after Betty's death.

¶ 15   In April 2016, the trial court entered a written order finding Greg to be a descendent of Betty for purposes of distribution under both trusts. Specifically, the court found, given the statutory presumption and the lack of language in the trust instruments suggesting any intent to exclude adopted children, Greg was entitled to take under the trusts as Betty's descendant. The court further rejected respondents' argument suggesting the adoption was a subterfuge similar to the adoptions occurring in *Cross v. Cross*, 177 Ill. App. 3d 588, 532 N.E.2d 486 (1988), and *Dixon v. Weitekamp-Diller*, 2012 IL App (4th) 120209, 979 N.E.2d 98. The court found:

> "Greg first became acquainted with Betty when he was [six] years old. Their relationship continued for over 30 years until her death in 2005. It is uncontradicted that Betty provided transportation to accommodate child visitation, that she took a special interest in Greg's activities as a youth, that Greg moved in with Betty and his father for a couple of months or so while he was in high school, that she had conversations with Greg's biological mother regarding his well being, and that Betty attended Greg's high school graduation. Greg was at Betty's bedside during her last few days. It is clear from the evidence that they shared a close relationship with Betty being more actively involved in Greg's life than might normally be expected of a step parent. The evidence shows that through Betty[,] Greg became a regular participant in Weidner family activities such as holiday and birthday celebrations and family vacations.

> There is little doubt that when Betty adopted Greg she was motivated in part by a desire to provide a means for him to be her descendant for purposes of inheritance, however, it is also abundantly clear from the evidence that her intent to provide for him financially in this manner was also the product of traditional parental desires. The court finds that the evidence fails to show the adoption was done *solely* for the purpose of making Greg an heir. There was no subterfuge as existed in *Cross* and like cases." (Emphasis in original.)

¶ 16   This appeal followed.

## II. ANALYSIS

¶ 18   On appeal, respondents argue the trial court erred in concluding Greg was a descendent of Betty for purposes of distribution under the Evelyn K. and Lyle F. Weidner, Sr. Trust and the Evelyn K. Weidner Children's Trust. Specifically, respondents argue (1) the record demonstrates that Evelyn and Lyle Sr. intended to exclude Greg from taking under the trusts and (2) Greg's adoption was an act of subterfuge for the purpose of distribution under the trusts. We review *de novo* a trial court's legal conclusions as to the construction and legal effect of a trust document. *Church of the Little Flower v. US Bank*, 2012 IL App (4th) 120266, ¶ 15, 979 N.E.2d 106.

¶ 19                                    A. Statutory Presumption and Trust Language

¶ 20        Section 2-4(e) of the Probate Act of 1975 (Ill. Rev. Stat. 1989, ch. 110½, ¶ 2-4(e) (now 755 ILCS 5/2-4(e) (West 2014))) provides: "For the purpose of determining the property rights of any person under any instrument executed on or after September 1, 1955, an adopted child is deemed a child born to the adopting parent unless the contrary intent is demonstrated by the terms of the instrument by clear and convincing evidence." See also *In re Estate of Brittin*, 279 Ill. App. 3d 512, 516, 664 N.E.2d 687, 690 (1996) ("The adoptee, regardless of his age upon adoption, attains the status of a natural child of the adopting parents."). Under the statutory presumption, Greg is unquestionably entitled to be treated as a beneficiary under the trusts.

¶ 21        In an attempt to rebut that presumption, respondents assert the record demonstrates Evelyn and Lyle Sr. intended to exclude Greg from taking under the trusts. In support, respondents highlight (1) the Wiedners' previous relationship with Greg, yet the lack of explicit inclusion as a beneficiary under the trust instruments, and (2) Lyle Sr.'s later exclusion of Greg in his will.

¶ 22        To rebut the statutory presumption in favor of adoptees, the evidence "must be something more in the terms of the instrument itself to demonstrate, at a minimum, that the testator actually considered the contingency of adoption." *First National Bank of Chicago v. King*, 165 Ill. 2d 533, 540-41, 651 N.E.2d 127, 131 (1995); see also *Continental Bank, N.A. v. Herguth*, 248 Ill. App. 3d 292, 300-01, 617 N.E.2d 852, 858 (1993) (Inglis, P.J., dissenting); *In re Estate of Roller*, 377 Ill. App. 3d 572, 582, 880 N.E.2d 549, 557 (2007). The trust instruments direct the distribution of the income and/or *res* to Betty "if then living; and if not then living, to her descendants, per stirpes, then living." This language does not provide clear and convincing evidence that Evelyn and Lyle Sr. intended to exclude adopted children from taking under the trusts. See *King*, 165 Ill. 2d at 541, 651 N.E.2d at 131 (finding the testator's use of the terms "lawful descendants" and "*per stirpes*" was not sufficient to demonstrate by clear and convincing evidence an intent to exclude adopted children from taking under the trust); *Estate of Roller*, 377 Ill. App. 3d at 584, 880 N.E.2d at 559 (finding the testator's use of the terms "natural children" and "heirs of the body" was not sufficient to demonstrate by clear and convincing evidence an intent to exclude adopted children from taking under the trust). We reject respondents' attempt to rely on speculative extrinsic evidence to demonstrate a contrary intent. Ill. Rev. Stat. 1989, ch. 110½, ¶ 2-4(e) (requiring the court to evaluate whether a contrary intent appears by the terms of the instrument). Respondents have failed to rebut the statutory presumption by clear and convincing evidence.


¶ 23                                    B. Limited-Use Subterfuge Exception

¶ 24        Respondents assert that, regardless of the statutory presumption, we should invoke the limited-use subterfuge exception to preclude Greg from taking under the trusts. Respondents argue Greg's adoption was an act of subterfuge for the purpose of distribution under the trusts. In support, respondents highlight (1) Greg's age when he was adopted, (2) the fact the adoption occurred one year after Evelyn's will was admitted to probate, (3) the fact Greg did not tell his biological mother about the adoption until Betty's death, and (4) Greg's testimony indicating Betty wanted to adopt him for estate reasons.

¶ 25        In 1988, the First District addressed the concept of a limited-use subterfuge exception. In *Cross*, 177 Ill. App. 3d at 589, 532 N.E.2d at 487-88, the testator died, leaving her estate in

trust and granting her son a testamentary power of appointment to distribute the *res* of the trust to any of her descendants. Any part of the trust estate not effectively appointed by the testator's son was directed to be divided equally amongst the testator's husband's nephews. *Id.* at 590, 532 N.E.2d at 488. One month after the testator's death, her 49-year-old son adopted the 36-year-old defendant as his son and then exercised his testamentary power of appointment in favor of the defendant as the grandson and descendant of the testator. *Id.* The exercise of the power of appointment was later challenged, and the trial court found the defendant was not a descendant of the testator. *Id.* On appeal, the court found the trust language demonstrated the testator's desire to have her estate remain in her family unless the family chose to give it to charity. *Id.* The court further found that to allow the testator's son to select by adoption the one to take his mother's estate would disregard the intent of the trust, a use of the adoption process the court could not condone. *Id.* at 591, 532 N.E.2d at 488. Specifically, the court noted: "The adoption of an adult solely for the purpose of making him an heir of an ancestor under the terms of a testamentary instrument known and in existence at the time of the adoption is an act of subterfuge." *Id.* at 591, 532 N.E.2d at 488-89. The defendant attempted to argue extrinsic facts to demonstrate the adoption was motivated by traditional parental desires. *Id.* at 592, 532 N.E.2d at 489. The court found, while it was unnecessary to review such facts, the record demonstrated any such argument to be unpersuasive. *Id.*

¶ 26    Almost 24 years later, our court had the opportunity to address and apply the limited-use subterfuge exception. In *Dixon*, 2012 IL App (4th) 120209, ¶ 8, 979 N.E.2d 98, Hughes was the life-estate income beneficiary of three trusts created by family members. Those trusts provided for the *res* of each to be distributed to Hughes' children at his death; however, if Hughes were to die without children, the *res* of each trust would go to Hughes' sister's children. *Id.* ¶¶ 1, 10-14. Eighty-seven-year-old Hughes, who had previously been unmarried, married his 71-year-old former assistant, Barbara. *Id.* ¶ 2. At the age of 94, Hughes adopted Barbara's four adult daughters, all of who were in their 50s. *Id.* ¶¶ 28, 30. Following Hughes' death, the trial court found Barbara's daughters were not entitled to take under the trusts as (1) the sole purpose of the adoptions was to take under the trusts and (2) the settlors of the trusts did not intend for the remainder interests to pass to nonfamily members who were adopted long after they became adults and were never raised by the family. *Id.* ¶ 32. On appeal, we found the trusts demonstrated the testators' intent to have the *res* of the trust remain in the testators' family, an intent that would be thwarted by allowing Barbara's daughters to take under the trusts. *Id.* ¶ 41. We further declined to enforce the statutory presumption and treat Barbara's daughters as Hughes' biological children as the record revealed their adoptions were for the sole purpose of making them beneficiaries under the trusts. *Id.* ¶ 39.

¶ 27    We are now tasked with determining whether the facts of this case warrant applying the limited-use subterfuge exception. In making that determination, we must consider the entire record to determine whether the adoption was an act of subterfuge for the sole purpose of taking under the trusts.

¶ 28    The record reveals a relationship significantly different than the relationships detailed in *Cross* and *Dixon*. Greg and Betty maintained an active, close relationship for over 30 years. Betty was his stepmother. She was an integral part of Greg's childhood, and Greg considered Betty as a mother. Greg lived with Betty and Ron for a period while in high school. Greg

became a regular participant in Weidner family holidays and vacations. During his childhood, Betty had expressed a desire to adopt. While Greg later moved away, he ultimately returned and spent much of his time with Betty and Ron.

¶ 29 Betty adopted Greg when he was 22 years old. At that time, Greg was living 10 miles from Betty and Ron. Greg suspected Betty would have adopted him earlier in life but she wanted to avoid stressing the relationship with Greg's biological mother. According to Greg, Betty sought to adopt for "estate reasons" and because she "really loved [him]." Greg suggested the adult adoption allowed him "to be in her estate" without taking away any of his biological mother's rights.

¶ 30 As the trial court succinctly stated:

> "There is little doubt that when Betty adopted Greg she was motivated in part by a desire to provide a means for him to be her descendant for purposes of inheritance, however, it is also abundantly clear from the evidence that her intent to provide for him financially in this manner was also the product of traditional parental desires."

We find the record fails to demonstrate Greg's adoption occurred *solely* for the purpose of taking under the trusts. We agree with the trial court's judgment and decline to invoke the limited-use subterfuge exception to preclude Greg from taking under the trusts.

¶ 31 III. CONCLUSION

¶ 32 We affirm the trial court's judgment.

¶ 33 Affirmed.